UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
TASHIMA B-ASIA WRIGHT,

                Plaintiff,

        - against -

KILOLO KIJAKAZI, Acting Commissioner of
Social Security,

                Defendant.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
22-CV-3310 (PKC)

PAMELA K. CHEN, United States District Judge:

Plaintiff Tashima B-Asia Wright filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) on June 6, 2022.[1]  (Dkt. 1.)  Plaintiff challenges the Social Security Administration's ("SSA") determination of her claim, which denied her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  (Administrative Transcript ("Tr.")[2], at 1.)  Plaintiff moved for judgment on the pleadings on January 4, 2023, and the Acting Commissioner of Social Security ("Commissioner") filed her cross-motion for judgment on the pleadings on February 9, 2023.  (Dkts. 12–17.)  For the reasons explained below, the Court grants Plaintiff's motion and denies the Commissioner's cross-motion.  This case is remanded for further proceedings consistent with this Memorandum and Order.

---

[1] 42 U.S.C. § 1383(c)(3) renders final determinations of claims for Supplemental Security Income subject to the same judicial review provisions as 42 U.S.C. § 405(g).

[2] All references to "Tr." refer to the consecutively paginated Administrative Transcript (*see* Dkt. 11), and not to the internal pagination of the constituent documents.

## BACKGROUND[3]

### I.   Procedural History

Plaintiff applied for DIB and SSI on June 27, 2017 (Tr. 132), alleging a disability onset date of October 19, 2016 (Tr. 133).  Plaintiff's case was initially heard by Administrative Law Judge ("ALJ") Gloria Pellegrino, who denied her claims by decision dated April 10, 2019.  (Tr. 173.)  But the Appeals Council granted Plaintiff's request for review and vacated ALJ Pellegrino's decision, remanding the case for another ALJ hearing.  (Tr. 180.)  On remand, ALJ Thomas Gray held two telephonic hearings, one on November 20, 2020, and a second on October 1, 2021.  (Tr. 13.)  On January 26, 2022, ALJ Gray issued a decision denying Plaintiff's DIB and SSI claims again.  (Tr. 10.)  On April 13, 2022, the Appeals Council declined to review ALJ Gray's decision, rendering the determination final.  (Tr. 1.)  Based upon the denial, Plaintiff timely filed this action, seeking reversal or remand of ALJ Thomas's determination.[4]  (Dkt. 1, ¶ 13.)

---

[3] The Court presumes the parties' familiarity with the facts in this case, and therefore recites only the facts that are relevant to the parties' instant motions below.

[4] According to 42 U.S.C. § 405(g):

> Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow.

42 U.S.C. § 405(g).  "Under the applicable regulations, the mailing of the final decision is presumed received five days after it is dated unless the [plaintiff] makes a reasonable showing to the contrary." *Kesoglides v. Comm'r of Soc. Sec.*, No. 13-CV-4724 (PKC), 2015 WL 1439862, at *3 (E.D.N.Y. Mar. 27, 2015) (citing 20 C.F.R. §§ 404.981, 422.210(c)).  The SSA's final decision was issued April 13, 2022 (Tr. 1), and the Complaint was filed on June 6, 2022 (Dkt. 1), 49 days after the presumed receipt of the decision, rendering this appeal timely.

II.      **November 20, 2020 ALJ Hearing**

On November 20, 2020, Plaintiff appeared at the telephonic hearing before ALJ Gray with her counsel, Aaron Vega.  (Tr. 77; *see generally* Tr. 77–109.)  The ALJ heard testimony from Plaintiff and a vocational expert, Marian Marracco (the "VE").  (Tr. 77.)

A.      **Plaintiff's Testimony**

Plaintiff testified that she lived with her three children, ages 18, 13, and 10.  (Tr. 92.)  At that time, she could no longer take the bus or subway because she got "excruciating pain down [her] lower extremities, [her] knees and [her legs]" when she walked.  (Tr. 93.)  As a result, she took "medical transportation" to get around.  (*Id.*)  When asked by the ALJ what kinds of things she was unable to do with her hands and fingers, she responded:

> I'm not able to mix.  When I say mix, I had to teach my daughter how to cook.  I'm currently pending a home health aide . . . to come help out.  I'm not able to stir things, mix things.  I'm not able to open up the jars.  I have to tell my daughter to do it. . . . I'm not able to close my left hand completely.  I'm not able to do any typing, because they're going to get cramped up.  I [am not] on the computer.  I trust the speaker thing, where whatever I want it to say, it will say.  Yeah, I need assistance with everything.  I have to send my daughter to do the laundry.  She has to go with me grocery shopping to get things off the shelf.

(Tr. 97.)  Plaintiff also testified that she experienced "excruciating" knee pain, which required her to alternate between sitting and standing every five minutes.  (Tr. 98.)

In addition to her physical ailments, Plaintiff testified that she suffered from post-traumatic stress disorder ("PTSD") because she was a domestic violence victim for 13 years:

> Certain triggers remind me of things I've been through with the domestic violence.  Loud noises, that bothers me. . . . And the triggers can be a physical thing—a thing—a visual thing, something you see, . . . like sometimes if I see a[n] object that was used on me, that may get me to start freaking out and thinking about what was done to me with a hammer, with a stick.  All of that plays a part in triggers and visual memory. . . . I [get] stuck, and I won't be able to get back to what I need to do, because my mind is so into whatever is triggering me.

(Tr. 100–01, 594.)

3

### B.    Vocational Expert

The ALJ asked the VE to consider two hypotheticals, first:

[A]ssume a hypothetical individual of Claimant's age and education with [past work as a housekeeper].  Further assume the individual retains the ability to perform *light work that requires no more than frequent reaching, handling, fingering or feeling*.  The individual retains only the ability to understand, remember, and carry out short and simple one or two-step instructions in a non-production-pace setting.[5] The individual can perform low stress work defined as work that requires only the ability to occasionally make work-related decisions, and that involves only occasional changes in the work setting.  The individual can tolerate occasional interaction with supervisors, coworkers and the general public. . . .  So frequent reaching, handling, fingering and fingering [sic]; you know, unskilled work more or less[.]

(Tr. 102–03 (emphasis added).)  The VE responded that such a hypothetical individual could perform their former work as a housekeeper, in addition to being a garment sorter, mail clerk/mail sorter, and a photocopy machine operator.  (Tr. 103.)  However, the VE noted that if this individual had to miss more than one workday per month, they could not perform these jobs because "[a]bsences of twice a month, especially at the unskilled level, is beyond the acceptable threshold[.]"  (Tr. 105.)

The ALJ then asked the VE to consider a second hypothetical:

[A]ssume a hypothetical individual of Claimant's age and education with [past work as a housekeeper].  Further assume this hypothetical individual retains the ability to perform *sedentary work that requires no more than occasional reaching, handling, fingering or feeling*.  The individual retains only the ability to understand, remember and carry out short and simple one or two-step instructions in a non-production-pace setting.  The individual can perform low stress work defined as work that requires only the ability to occasionally make work-related decision[s], and that involves only occasional changes in the working setting.  The individual can tolerate occasional interaction with supervisors, coworkers and the general public.

---

[5] Plaintiff's attorney asked the VE to define non-production pace (Tr. 106.)  The VE testified that a non-production pace setting is one that "[still] requires . . . certain things to be completed, but . . . not [at] a production pace. . . . you will have certain goals to meet, but they're not production pace."  (Tr. 106.)

(Tr. 104 (emphasis added).)  The VE responded that there was no job in the national economy for such an individual.  (Tr. 105.)

### III.   October 1, 2021 ALJ Hearing

On October 1, 2021, Plaintiff appeared before ALJ Gray again in a telephonic hearing, represented by her counsel, Mr. Vega.  (Tr. 110; *see generally* Tr. 110–31.)  ALJ Gray heard testimony from Plaintiff and a vocational expert, Joseph Young.  (Tr. 110.)

#### A.   Plaintiff's Testimony

Plaintiff's attorney explained that the supplemental hearing was requested, in part, to review newly submitted evidence from Plaintiff's primary care doctor, Dr. Brian Hoch,[6] who "indicate[d] that [Plaintiff] has residual functional capacity that's less than sedentary."  (Tr. 115–16, 125 (Plaintiff explaining that Dr. Hoch is her "medical doctor"), 32 (ALJ "not[ing] that Dr. Hoch is the claimant's primary care physician").)  Specifically, Dr. Hoch noted that Plaintiff could only "sit for a maximum of one hour total per day, and standing the same, about one hour total per day."  (Tr. 116; *see* Tr. 1339.)  Plaintiff's attorney argued that Dr. Hoch's opinion was supported by Plaintiff's newly submitted physical therapy records from Ahava, which indicated "joint pain, muscle weakness and spasm."  (Tr. 116, *see also* Tr. 694–721.)  Plaintiff herself noted that she had recently seen a neurologist who diagnosed her with carpal tunnel syndrome, and that she now wore a hand brace at night to treat it.  (Tr. 119.)  She also explained that she could not hold the phone without cramping and was therefore participating in the call through speakerphone.  (Tr. 125.)

Plaintiff also testified that since the last hearing, she now had a White Glove aide who assisted with daily tasks around the house, and her daughter now fully did the grocery shopping and laundry because Plaintiff could not.  (Tr. 127.)

---

[6] The transcript misspells Dr. Hoch's name as Dr. Hawk.

### B.    Vocational Expert

Plaintiff's attorney asked the VE the following hypothetical:

If a person of the same age, education and work background as the Claimant—and assuming the person was going to be absent more than three times a month as a result of their impairments or treatment, would the person be able to perform any of their past work or other jobs?

(Tr. 129.)  The VE responded no, because an individual could not miss more than one day per month, or seven days per year, "to maintain any type of competitive employment."  (*Id.*)

## IV.    ALJ Decision

The Court first explains the ALJ's five-step inquiry for evaluating disability claims.  The plaintiff bears the burden of proof at the first four steps of the inquiry; the Commissioner bears the burden at the final step.  *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citation omitted).  First, the ALJ determines whether the plaintiff is currently engaged in "substantial gainful activity."  20 C.F.R. § 416.920(a)(4)(i).  If the answer is yes, the plaintiff is not disabled.  *Id.*  If the answer is no, the ALJ proceeds to the second step to determine whether the plaintiff suffers from a severe impairment.  *Id.* § 416.920(a)(4)(ii).  An impairment is severe when it "significantly limits [the plaintiff's] physical or mental ability to do basic work activities."  *Id.* § 416.922(a).  If the plaintiff does not suffer from an impairment or combination of impairments that is severe, then the plaintiff is not disabled.  *Id.* § 416.920(a)(4)(ii).  But if the plaintiff does suffer from an impairment or combination of impairments that is severe, then the ALJ proceeds to the third step and considers whether it meets or medically equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  *Id.* § 416.920(a)(4)(iii); *id.* pt. 404, subpt. P, app. 1. If the ALJ determines at step three that the plaintiff has one of the listed impairments, then the ALJ will find that the plaintiff is disabled under the Act.  *Id.* § 416.920(a)(4)(iii).  On the other hand, if the plaintiff does not have a listed impairment, the ALJ must determine the plaintiff's

6

residual functional capacity ("RFC") before continuing to steps four and five.  To determine the plaintiff's RFC, the ALJ must consider the plaintiff's "impairment(s), and any related symptoms, [that] may cause physical and mental limitations that affect what [the plaintiff] can do in a work setting."  *Id.* § 416.945(a)(1).  The ALJ will then use the RFC finding in step four to determine if the plaintiff can perform past relevant work.  *Id.* § 416.920(a)(4)(iv).  If the answer is yes, the plaintiff is not disabled.  *Id.*  Otherwise, the ALJ will proceed to step five and determine whether the plaintiff, given their RFC, age, education, and work experience, has the capacity to perform other substantial gainful work in the national economy.  *Id.* § 416.920(a)(4)(v).  If the answer is yes, the claimant is not disabled; otherwise, the claimant is disabled and is entitled to benefits.  *Id.*

Here, at step one, the ALJ found that Plaintiff met the insured status requirements of the Act and that Plaintiff had not engaged in substantial gainful activity since October 19, 2016, the alleged onset date.  (Tr. 16.)  At step two, the ALJ found that Plaintiff had the following severe impairments: degenerative joint disease of the knees, hips, and ankle; deformities of the fingers of the bilateral hands; right hand contracture; status-post sebaceous cysts and fibrous tumor of right hand; degenerative joint disease of the right hand; bilateral carpal tunnel syndrome; degenerative disc disease of the lumbar spine; varicose veins of the bilateral lower extremities; anemia; sickle cell trait; hepatomegaly; PTSD; major depressive disorder; generalized anxiety disorder; schizoaffective disorder; and post-concussion syndrome.  (*Id.*)

At the third step, the ALJ determined that none of Plaintiff's impairments, individually or in combination, met or medically equaled the severity of any of the impairments in the Listings.  (Tr. 17–19.)  Specifically, regarding her upper extremities, he found that Plaintiff had "not established an inability to use both upper extremities to the extent that neither can be used to

independently initiate, sustain, and complete work-related activities involving fine and gross movements." (Tr. 17.)

The ALJ accordingly proceeded to step four and concluded that Plaintiff had the following RFC:

> [Plaintiff] has the residual functional capacity to perform light work . . . except that she *can frequently reach, handle, finger and feel.* She can understand, remember and carry out short and simple one-or-two-step instructions in a non-production paced setting. She can perform low-stress work, defined as work that requires only the ability to occasionally make work-related decisions and that involves only occasional changes in the work setting. She can tolerate occasional interaction with supervisors, coworkers, and the general public.

(Tr. 19–20 (emphasis added).)

At step five, the ALJ concluded that Plaintiff was capable of performing her past work as a housekeeper, and that moreover, she could also work as a garment sorter, mail clerk/mail sorter, and photocopy machine operator. (Tr. 34.)

## STANDARD OF REVIEW

Unsuccessful claimants for benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of benefits. 42 U.S.C. §§ 405(g) and 1383(c)(3). "In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Agolli v. Comm'r of Soc. Sec.*, No. 20-CV-5369 (MKB), 2023 WL 6050096, at *3 (E.D.N.Y. Sept. 15, 2023) (quoting *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005)). "Courts review de novo whether the correct legal principles were applied and whether the legal conclusions made by the [ALJ] were based on those principles. *Coulter v. Comm'r of Soc. Sec.*, --- F. Supp. 3d ----, 2023 WL 3346505, at *1 (S.D.N.Y. 2023); *see also Douglass v. Astrue*, 496 F. App'x 154 (2d Cir. 2012) ("Failure to

apply the correct legal standard constitutes reversible error, including, in certain circumstances, failure to adhere to the applicable regulations.").

"If the reviewing court is satisfied that the ALJ applied the correct legal standards, then the court must 'conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision.'" *Coulter*, 2023 WL 3346065, at *1 (quoting *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam)). "Substantial evidence" is "more than a mere scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (internal quotation and alterations omitted); *see also Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013) ("An ALJ need not recite every piece of evidence that contributed to the decision, so long as the record permits [the court] to glean the rationale of an ALJ's decision[.]" (internal quotation omitted)). If there is substantial evidence in the record to support the Commissioner's factual findings, those findings are conclusive and must be upheld. 42 U.S.C. § 405(g); *see also Cichocki*, 729 F.3d at 175–76. However, "[i]f . . . the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the Commissioner's decision." *Agolli*, 2023 WL 6050096, at *3.

## DISCUSSION

Plaintiff argues that the ALJ failed to properly assess the medical evidence of Plaintiff's disabilities in determining Plaintiff's RFC. (Dkt. 13, at 15–25.) The Commissioner, in opposition, argues that "substantial evidence supported the ALJ's finding that Plaintiff had the RFC to perform a reduced range of light work." (Dkt. 16, at 18.) The Court agrees with Plaintiff. For the reasons below, the Court finds that the ALJ inappropriately relied on non-examining experts, consultative

9

examiners, and stale medical opinions—at the expense of relevant, updated medical evidence—to

determine Plaintiff's RFC.  Thus, the ALJ's decision was not supported by substantial evidence.

## I.      Inappropriate Reliance on Non-Examining Experts and Consultative Examiners

"ALJs should not rely heavily on the findings of consultative physicians after a single

examination."  *Estrella v. Berryhill*, 925 F.3d 90, 98 (2d Cir. 2019) (quoting *Selian*, 708 F.3d at

419); *see also Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) (finding that a "one-

shot" examination "is not substantial evidence" and "two SSA consulting physicians" who did not

examine the plaintiff "are also not substantial evidence").  Especially "where a consultative

examiner did not review important medical records, the consultative examiner's opinion cannot

constitute . . . substantial evidence to support an RFC."  *Benitez v. Comm'r of Soc. Sec.*, No. 20-

CV-5026 (RWL), 2021 WL 4239244, at *15 (E.D.N.Y. Sept. 17, 2021) (collecting cases).  "This

concern is even more pronounced in the context of mental illness where . . .  a one-time snapshot

of a claimant's status may not be indicative of her longitudinal mental health."  *Estrella*, 925 F.3d

at 98.

### A.      Analysis

Here, the ALJ relied solely on the 2017 and 2018 opinions of two consultative examiners,

Beth Ehrenpreis, PhD, and Dr. Olga Yevsikova (Internal Medicine) (Tr. 672, 678), and two non-

examining experts, Dr. L. Samuel, MD (Tr. 137, 142) and Dr. E. Gagan (Tr. 143),[7] to determine

Plaintiff's RFC.  (*See* Tr. 29–31 (ALJ finding all four opinions "somewhat persuasive"; Tr. 31–32

(ALJ discounting and finding all remaining opinions "minimally persuasive").)  Dr. Yevsikova

---

[7] The record does not appear to indicate what Dr. Samuel's specialty is, and although ALJ
Gray identifies the psychological consultant E. Gagan as a "Dr." and "MD" in the ALJ Decision
(Tr. 31, 181), it is not apparent from E. Gagan's report that s/he is either a PhD psychologist or
medical doctor (*see, e.g.*, Tr. 138, 143, 145).

and psychologist Ehrenpreis both conducted one-time examinations of Plaintiff in September 2017.  (Tr. 29–30.)  Neither consultative examiner's opinions reflect a review of Plaintiff's important medical records; rather, they appear to rely solely on Plaintiff's self-reported medical history at the examinations.  (*See* Tr. 672–82.)  The other two consultants, Dr. Samuel and E. Gagan, whose opinions the ALJ relied on, did not examine Plaintiff; rather, they reviewed Plaintiff's records from before February 2018.  (Tr. 30–31.)  Thus, the Court finds that the ALJ's determination is not supported by substantial evidence because "one-shot" examinations and non-examining "consulting physicians" are not substantial evidence.  *See Green-Younger*, 335 F.3d at 107.

This error was especially consequential because the ALJ discounted the only treating source opinion he reviewed, Plaintiff's internist Dr. Hoch, who examined Plaintiff in December 2020.[8]  (Tr. 31.)  Dr. Hoch's opinion reported that Plaintiff could not "stand/walk continuously in a work setting", had "moderate limitations grasping, turning, and twisting objects bilaterally[,]" and had "PTSD and anxiety . . . such that [Plaintiff] was incapable of even 'low stress' work."  (Tr. 31–32.)  Importantly, Dr. Hoch opined that Plaintiff's conditions required her to have "unscheduled breaks every hour for 10 minutes" and "be absent more than three times per month." (Tr. 32.)  However, the ALJ found Dr. Hoch's opinion "only minimally persuasive" (Tr. 32), despite Dr. Hoch's opinion being corroborated by Plaintiff's physical therapy records.  (Tr. 695–708 (reporting, among other things, Plaintiff's "hand weakness," inability "to open jars and/or

---

[8] Defendant baselessly asserts that "there is no evidence in the record that Dr. Hoch personally examined Plaintiff." (Dkt. 16, at 24.) However, Defendant is plainly wrong. The Court has thoroughly reviewed the record and finds multiple references to Dr. Hoch's examinations of Plaintiff. (*See, e.g.*, Tr. 124–25 (Plaintiff explaining during October 2021 hearing that she is due to see Dr. Hoch for an exam later that month); Tr. 1337 (Dr. Hoch's notes indicating that Plaintiff's "most recent exam" by him was November 18, 2020).)

containers" or perform other activities of daily living, "[p]oor endurance," need for "continuous rest breaks to complete dressing tasks, "antalgic gait, knee wobble, inadequate knee extension and inadequate toe clearance," and "risk of fall").)  Thus, the ALJ further erred by cherry-picking the non-treating source opinions that best supported his own view.  *See Jones v. Saul*, No. 19-CV-5542 (LGS) (BCM), 2020 WL 5775525, at \*12 (S.D.N.Y. Sept. 11, 2020), *report and recommendation adopted*, 2020 WL 5775195 (Sept. 28, 2020) ("[A]n ALJ may not 'cherry-pick' medical opinions, or selectively cite treating notes or diagnostic imaging that support the ALJ's own view while ignoring opinions and evidence that do not.").

## II.   Inappropriate Reliance on Stale Medical Opinions

### A.   Legal Standard

"It is error for an ALJ not to account for the fact that medical opinions are stale." *Rodriguez v. Comm'r of Soc. Sec.*, No. 20-CV-3687 (VSB) (RWL), 2021 WL 4200872, at \*18 (S.D.N.Y. Aug. 19, 2021) (quoting *Chambers v. Comm'r of Soc. Sec.*, No. 19-CV-2145 (RWL), 2020 WL 5628052, at \*12 (S.D.N.Y. Sept. 21, 2020)).  "A medical opinion is not necessarily stale simply based on its age.  A more dated opinion may constitute substantial evidence if it is consistent with the record as a whole notwithstanding its age." *Id.* (quoting *Biro v. Comm'r of Soc. Sec.*, 335 F. Supp.3d 464, 470 (W.D.N.Y. 2018)).  "However, a medical opinion may be stale if it does not account for the claimant's deteriorating condition." *Id.* (collecting cases); *see also Jones v. Comm'r of Soc. Sec.*, No. 10-CV-5831 (RJD), 2012 WL 3637450, at \*1–2 (E.D.N.Y. Aug. 22, 2012) (finding that ALJ should not have relied on medical opinion in part because it "was 1.5 years stale" as of plaintiff's hearing date and "did not account for her deteriorating condition"); *Almonte v. Comm'r of Soc. Sec.*, No. 21-CV-3091 (PKC), 2022 WL 4451042, at \*10 (E.D.N.Y. Sept. 23, 2022) (remanding because ALJ relied on stale medical evidence when claimant's condition had since worsened).

B.      Analysis

The ALJ concluded that Plaintiff could engage in non-sedentary work because her "treatment records [we]re not consistent with a finding that the claimant ha[d] significant limitations in daily activities." (Tr. 28.)  Specifically, he reasoned:

> Regarding physical impairments including the hand, knee, back, and ankle impairments, and carpal tunnel syndrome and post-concussion syndrome, the record reflects a conservative course of treatment with physical/occupational therapy and medication management.  The record reflects no MRI's, no injections, no surgical management, and no use of assistive devices.  The conservative course of treatment is not consistent with the claimant's testimony that she can sit for no more than five minutes due to knee pain, particularly as knee x-rays were normal during the period at issue, aside from enthesophytes. . . . If the claimant suffered from such intense physical symptomatology, one would expect to see further attempts at treatment beyond pain medication and physical therapy after x-rays.  In limiting the claimant to light work with further limitation regarding frequent reaching, handling, fingering, or feeling, I have more than accounted for the limitations that the record is able to support.

(Tr. 29.)  In reaching this conclusion, the ALJ relied almost exclusively on stale medical evidence from 2017 and 2018, prior to the worsening of Plaintiff's physical condition from 2019 through 2021.  As discussed above, the ALJ gave the most weight to opinions rendered by one-time consultative examiners and non-examining experts who reviewed Plaintiff in 2017 and 2018, and discounted the December 2020 opinion of Plaintiff's primary care physician.  *See supra* Discussion Section I.  However, Plaintiff's medical condition clearly deteriorated in 2019 and beyond.

Although Plaintiff reported to the consultative internist, Dr. Yevsikova, in September 2017 that she cooked and cleaned, did laundry once per week, and shopped once per month (Tr. 28), by 2019, her condition had markedly changed.  As noted above, in Plaintiff's February 10, 2019 occupational therapy plan and treatment notes, her therapist noted that "[patient] has . . . hand weakness and is unable to open jars and/or containers.  [Plaintiff] lives with family who assist her . . . with most [activities of daily living] such as . . . dressing, [i.e.,] donning shoes and socks and undergarments due to difficulty bending and pain, bathing and grooming. . . . [Plaintiff] is unable

13

to perform cooking tasks due to inability to hold a 1lb pot[,] due to neck, sh[oulder] and hand pain." (Tr. 695.)  The occupational therapist further noted: "[d]ecreased dexterity interfering with fine motor tasks including opening jars and/or containers. . . . Poor endurance [Plaintiff] needs continuous rest breaks to complete dressing tasks." (*Id.*)  Plaintiff's physical therapy notes from the same day found Plaintiff's gait to be unstable. (Tr. 704–05.)  Specifically, her physical therapist noted that the "[p]atient exhibits poor posture with antalgic gait, knee wobble, inadequate knee extension and inadequate toe clearance.  During gait, she is noted with absent push off, decreased cadence, decreased accuracy of movements. . . .  [P]atient also has risk of fall." (Tr. 704.)

As also discussed above, Dr. Hoch observed that by December 2020, Plaintiff "could not sit continuously in a work setting, and had to get up and move every five minutes and wait five to 10 minutes before sitting again." (Tr. 31.)  However, she also "could not stand/walk continuously in a work setting." (*Id.*)  Further, he noted that Plaintiff could lift and carry up to five pounds, but had "moderate limitations grasping, turning, and twisting objects bilaterally" and "using fingers/hands for fine manipulations and using arms for reaching bilaterally." (*Id.*)

Finally, during Plaintiff's October 2021 hearing, she reported that since the last hearing in November 2020, she now required her daughter and a home aide to assist with daily activities of living. (Tr. 127.)  Moreover, she informed the ALJ that she was participating in the hearing via speakerphone because she could not "hold the phone to [her] ear [for] too long" without her hands "cramping up." (Tr. 125.)

Despite clear evidence of Plaintiff's worsening physical condition in both her lower and upper extremities over the course of 2019–2021, the ALJ relied solely on opinions given by consultive and non-examining medical professionals before February 2018 to conclude that

14

Plaintiff had the RFC to "frequently reach, handle, finger, and feel" (Tr. 19), and specifically, to perform the non-sedentary jobs of a housekeeper, garment sorter, mail clerk/mail sorter, and photocopy machine operator (Tr. 33–34). Such dependance on outdated medical evidence to support a non-sedentary RFC determination, in the face of substantial, post-2019 evidence indicating that Plaintiff could only perform—at most— sedentary work, is reversible error.[9] *See Almonte*, 2022 WL 4451042, at *10.

Lastly, the ALJ's error was especially consequential given the VE's testimony that simply changing one of the elements in Plaintiff's RFC from non-sedentary to sedentary, would result in no jobs being available in the national economy.[10] (Tr. 104–05.) Thus, on remand, the Court cautions that the ALJ should pay particular attention to medical opinions rendered post-2018 from treating sources, to determine whether Plaintiff can perform more than sedentary work and miss less than seven days of work per year.

## CONCLUSION

For the above reasons, Plaintiff's motion for judgment on the pleadings is granted and the Commissioner's motion is denied. The Commissioner's decision is vacated, and this action is remanded for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).

---

[9] The Court is especially troubled by the ALJ's finding that Plaintiff could be a housekeeper, garment sorter, mail clerk/mail sorter, or photocopy machine operator (Tr. 34)—jobs that all require dexterous and frequent hand usage—given the overwhelming evidence in the record that Plaintiff had deformed fingers (Tr. 16), inability to open jars and pots (Tr. 695), inability to hold the phone without cramping (Tr. 125), and moderate limitations in lifting her arms (Tr. 31).

[10] (*Compare* Tr. 102 (ALJ asking first hypothetical, including to "assume the individual retains the ability to *perform light work that requires no more than frequent reaching, handling, fingering or feeling.*") *with* Tr. 104 (ALJ asking second hypothetical, which was identical to first hypothetical except to "assume this hypothetical individual retains the ability to *perform sedentary work that requires no more than occasional reaching, handling, fingering or feeling.*").)

15

SO ORDERED.

/s/ *Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated:  September 28, 2023
          Brooklyn, New York